UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                          :

CEDRIC REID,                             :
                                          :
                   Plaintiff,       :
                                          :
                -v-                 :           17-cv-1124 (KBF)
                                          :

P.O. DUMBERGER et al.,           :           OPINION & ORDER
                                          :
                   Defendants.    :
                                          :
------------------------------------------------------------ X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: February 12, 2018

KATHERINE B. FORREST, District Judge:

On February 14, 2017, incarcerated pro se plaintiff Cedric Reid commenced this action against the Parole Officer ("PO") J. Dumberger, PO Johnson, PO R. Campbell, PO D. Ancrum, and Supervising Parole Officer ("SPO") Derek Jones (collectively, "defendants") in their official and individual capacities. (ECF No. 1.) Plaintiff brings suit under 42 U.S.C. § 1983, alleging violations of his constitutional rights.

Plaintiff filed his First Amended Complaint on November 28, 2017. (ECF No. 41.) Pending now before the Court is defendants' motion to dismiss. (ECF No. 47.) Because plaintiff has failed to plausibly state a claim upon which relief can be granted, the motion to dismiss is hereby GRANTED.

I.     BACKGROUND

The factual allegations below are derived from plaintiff's Amended Complaint and presumed true for the purposes of this motion.

1

A. Plaintiff's Release from Prison

From 1999 to 2014, plaintiff served a fifteen-year sentence for attempted robbery in the first and second degree (a violent, class C felony) and criminal possession of a weapon in the second and third degree. (Am. Compl. ¶ 1.)[1] About a month before his release, plaintiff composed a two-page letter of complaint ("LOC") in anticipation of his residence assignment. In that letter, he opposed, inter alia, his assignment to an alcohol and substance abuse treatment program as well as the "deliberate indifference" of parole officers generally. (Am. Compl., Ex B.) Specifically, he argued that POs were deliberately indifferent to the safety of parolees and others, because they carry service weapons "when at [their] desk[s], where dangerous parolees like myself have nothing to lose, by disarming a nearby armed parole officer, and causing serious bodily injury, if not immediate death; head shots." (Id. at 2.)

On February 25, 2014, plaintiff received and signed his parole Conditions of Release Agreement, which included restrictions on carrying weapons, reporting requirements about any changes in his address, and a grant of permission for searches of his person, residence, and property. (Id. ¶ 2; Am. Compl., Ex. A.) He had previously been provided with a memorandum that assigned him to an approved residence program in the Bronx, Narco Freedom House 19 ("Narco

[1] Three days earlier, he had signed his parole agreement, which outlined the conditions of his release. (Id.) His conditions included, inter alia, reporting to his parole officer within twenty-four hours of release; permitting his parole officer to visit his residence and search his person, residence, and property; refraining from violating the law; and refraining from owning, possessing, or purchasing a deadly knife or any other instrument "capable of causing physical injury" without a satisfactory explanation. (Am. Compl., Ex. A.)

Freedom"), (Am. Compl. ¶ 11; Am. Compl., Ex. D), and his Conditions of Release Agreement confirmed that assignment, (Am. Compl., Ex. A). The next day, February 26, plaintiff was evaluated for mental stability, allegedly because of his LOC, but he was cleared and approved for release. (Am. Compl. ¶¶ 4-5.)

On February 28, 2014, plaintiff was released from prison and taken to a bus depot, where he boarded a bus to New York city between 1:00-1:30 p.m. (Id. ¶ 9.) He arrived at the New York City Port Authority Bus Terminal between 9:00-9:30 p.m., (id. ¶ 9), and alleges that he arrived at Narco Freedom between 11:00-11:15 p.m. that same evening, (id. ¶ 12). Plaintiff alleges that he refused entry due to the time and was instructed to return on Monday. (Id.) As a result, he claims, he went to his sister's apartment, also in the Bronx, where called his parole officer but received no response. (Id. ¶ 13.)

B. Plaintiff's 2014 Parole Revocation

On the morning of Monday, March 3, 2014, plaintiff alleges that he returned to Narco Freedom "to begin the processing [phase]" and then to the Human Resour[c]e Administration to seek public assistance for payment of the room and board fee. (Id. ¶ 14.) Afterward, Reid went to check in with his parole officer, Dumberger. (Id. ¶ 15.) Johnson ordered him to enter, though she allegedly posed as Dumberger. (Id. ¶ 16.) Plaintiff was subsequently questioned by Campbell, Jones, and Freeman. (Id.) Defendants then served plaintiff with a Notice of Violation for changing his address without notifying his parole officer and for failing to answer truthfully when asked why he did not go to his approved residence upon

his release from prison.  (Id. ¶ 17; Am. Compl., Ex. F; Am. Compl., Ex G.)  Plaintiff

was re-incarcerated at Rikers.  (Id. ¶ 17.)  A preliminary hearing was scheduled to

occur on March 10, 2016, (Am. Compl. ¶¶ 17-18), but Dumberger requested an

adjournment to add a third charge for threatening to use deadly force, based on

plaintiff's LOC, (id. ¶ 20).  The hearing occurred on March 17, 2014; the hearing

officer determined that no probable cause existed as to any of the charges against

plaintiff.  (Id.; Am. Compl. Ex. J.)  Thereafter, plaintiff was subsequently released

from Rikers.

   C.  The October 24, 2014 Incident

        Reminiscent of the LOC that he wrote in early 2014, plaintiff alleges that

between March 2014 and September 2016, SPOs Jones and Freeman were

"deliberately indifferent" to the health and safety of parolees by allowing POs to

carry service weapons, since "[a]n upset parolee with nothing [to] lose, as well as in

good shape, could easily subdue and/or disarm a P.O. and remove their service

weapon, and use it on the SPO, P.O., Parolee, First Responder, and th[e]n turn it on

him or herself, not necessarily in that order."  (Id. ¶ 21 (emphasis in original).)  He

also claims that, in the same time frame, Freeman, Jones, and Dumberger were

deliberately indifferent to plaintiff's reintegration back into the community, as they

failed to recognize plaintiff's need for an anger management program.  (Id. ¶ 22.)

        Presumably as evidence of this, plaintiff recounts that, while he was

employed by a tour bus agency, on October 24, 2014, he experienced an altercation

with a female sales employee who "prematurely disposed of Reid's food that he

4

stored" in the office's miniature refrigerator.  (Id.)  Plaintiff responded to this by taking "the manager's pocket-book, out onto the street's sidewalk and dumped the entire contents out, in front of the Tour, over the train station's grate, and destroyed her property, e.g., bent Credit Cards, Metro Card, slammed her i-Pod, ripped the pocket-book apart, and threw her purse at her feet . . . ."  (Id.)

Plaintiff did not mention the incident to his parole officer, as there was no police involvement.  (Id.)  At his next two parole check-in dates, however, two New York City Police Department ("NYPD") officers were present; at one of these check-ins (it is unclear which), plaintiff was placed under arrest.  (Id.)  Plaintiff's parole was revoked on December 19, 2014 and he was charged with a number of criminal offenses; he eventually pled guilty to disorderly conduct.  (Id.)  He was released sometime in March 2015 and was required to attend anger management courses and pay restitution.  (Id.)

D.  Plaintiff's 2016 Parole Revocation

On September 16, 2016, Campbell and five other POs initiated an unscheduled home visit at plaintiff's approved residence.  (Id. ¶ 23.)  While plaintiff attempted to make a call on his cellphone, Campbell allegedly told him to turn his phone off.  (Id.)  The exhibits submitted by plaintiff demonstrate that during this visit, he was found in possession of an imitation handgun and a gravity knife, in violation of the conditions of his release.  (Am. Compl., Exs. K, M.)  Plaintiff alleges that Campbell attempted to search his phone, and that Ancrum told plaintiff that the "information on [his] cellphone is just as accessible as [his] wallet, in that [he

5

has] no privacy in it from parole." (Id.)  Plaintiff did not hand over the phone

voluntarily, but Campbell seized it, as well as the imitation handgun, gravity knife,

and a set of keys, at the end of the visit.[2] (Am. Compl. Ex. K.)  Reid was

subsequently handcuffed and taken to Bronx County's Department of Corrections.

(Am. Compl. ¶ 23.)  At this time, plaintiff is still incarcerated as a result of that

visit.

## II.    LEGAL PRINCIPLES

### A.  Pro Se Pleadings and Motions to Dismiss

All complaints, including those filed by a pro se plaintiff, must comply with

the basic principles of Rule 8 of the Federal Rules of Civil Procedure.  Rule 8

provides that every complaint must contain a "short and plain statement of the

claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8.  These

"[f]actual allegations must be enough to raise a right to relief above the speculative

level."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Rule 8 "asks for more

than a sheer possibility that a defendant has acted unlawfully.  Where a complaint

pleads facts that are merely consistent with a defendant's liability," it cannot

survive a motion to dismiss.  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal

quotations and citation omitted).  Despite the well-established rule in this Circuit

that pro se complaints are to be examined with "special solicitude," liberally

construed, and interpreted to raise "the strongest arguments they suggest,"

Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 474-75 (2d Cir. 2006), a pro se

---

[2] Plaintiff also alleges the seizure of mail and an empty brown wallet, though the property receipt he submitted does not mention these items.  (Am. Compl. ¶ 23; Am. Compl. Ex. K.)

plaintiff must still, to survive a motion to dismiss, plead enough facts to state a claim to relief that is plausible on its face, Hill v. Curcione, 657 F.3d 116, 122 (2d Cir. 2011). This must be "more than an unadorned, the-defendant-unlawfully-harmed-me accusation." Iqbal, 556 U.S. at 678.

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must provide grounds upon which their claim rests through "factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Twombly, 550 U.S. at 555). That is to say, as discussed, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

In applying that standard, the court accepts as true all well-pled factual allegations, but it does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. Furthermore, the Court will give "no effect to legal conclusions couched as factual allegations." Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). If the Court can infer no more than the mere possibility of misconduct

from the factual averments—in other words, if the well-pled allegations of the complaint have not "nudged [plaintiff's] claims across the line from conceivable to plausible"—dismissal is appropriate.  Twombly, 550 U.S. at 570.

Additionally, at the motion to dismiss stage, a court may consider "any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference."  Chambers v. Time Warner, Inc., 282 F.3d 147, 152 (2d Cir. 2002) (quoting Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co., 62 F.3d 69, 72 (2d Cir. 1995)); see also Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

B. Section 1983 Claims

Plaintiff has alleged the following claims, brought pursuant to 42 U.S.C. § 1983: violation of his First Amendment rights, violation of his Fourth Amendment rights, false arrest, malicious prosecution, violations of his right to due process, deliberate indifference, failure to supervise and/or intervene, and conspiracy.

1. First Amendment

In order to state a § 1983 claim for First Amendment retaliation, plaintiff must allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  See Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004)).  An action is sufficiently adverse to sustain a retaliation claim

when it "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights." Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003 (citing Dawes v. Walker, 239 F.3d 489, 493 (2d Cir. 2001)). The filing of grievances generally constitutes protected speech, see generally Gill, 389 F.3d 379, but "[t]o satisfy the causal connection requirement of the prima facie case, plaintiffs must show that their criticisms . . . were 'a substantial motivating factor'" in the action taken against them, Washington v. Cty. of Rockland, 373 F.3d 310, 321 (2d Cir. 2004) (quoting Deters v. Lafuente, 368 F.3d 185, 190 (2d Cir. 2004)). "To do so, plaintiffs must aver some 'tangible proof' demonstrating that their protected speech animated" the adverse action, rather than relying "on conclusory assertions of retaliatory motive." Id. at 321 (quoting Deters, 368 F.3d at 190).

　　2. Fourth Amendment

　　In general, courts examine the totality of circumstances when deciding whether a search and seizure was reasonable. Samson v. California, 547 U.S. 843, 848 (2006). "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" Id. (quoting United States v. Knights, 543 U.S. 112, 118-19 (2001)).

　　Parolees, however, have a diminished expectation of privacy. Id. (noting that "parole is an established variation on imprisonment of convicted criminals . . . . The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the

sentence." (quoting <u>Morrissey v. Brewer</u>, 408 U.S. 471, 477 (1972))); <u>see also</u> <u>United States v. Grimes</u>, 225 F.3d 254, 258 (2d Cir. 2000) (noting that "parole justifies some departure from traditional Fourth Amendment standards").  "The New York Court of Appeals has explained that 'whether [a parole search] was unreasonable and thus prohibited by constitutional proscription must turn on whether the conduct of the parole officer was rationally and reasonably related to the performance of the parole officer's duty.'"  <u>Grimes</u>, 225 F.3d at 258-59 (quoting <u>People v. Huntley</u>, 371 N.E.2d 794, 797 (N.Y. 1977)) (alteration in original).

      3.  <u>False Arrest & Malicious Prosecution</u>

         i.  <u>False Arrest</u>

A § 1983 false arrest claim is substantially the same as a claim of false arrest under New York law.  <u>See, e.g.</u>, <u>Weyant v. Okst</u>, 101 F.3d 845, 852 (2d Cir. 1996). Under New York law, a plaintiff claiming false arrest must show that "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement[,] and (4) the confinement was not otherwise privileged."  <u>Ackerson v. City of White Plains</u>, 702 F.3d 15, 19 (2d Cir. 2012) (citing <u>Broughton v. State of New York</u>, 335 N.E.2d 310, 314, 456 (N.Y. 1975)).  "An arrest is privileged when it is made pursuant to a warrant valid on its face, or when it is based on probable cause."  <u>Okoroafor v. City of New York</u>, No. 07-cv-9387, 2013 WL 5462284, at *3 (S.D.N.Y. Sept. 25, 2013) (internal quotation and citations omitted).

ii.   Malicious Prosecution

Under New York law, a plaintiff must establish four elements to state a claim for malicious prosecution: "(1) the initiation and continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) the lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." Dellutri v. Village of Elmsford, 895 F. Supp. 2d 555, 569 (S.D.N.Y. 2012) (citing Jocks v. Tavernier, 316 F.3d 128, 136 (2d Cir. 2003)).  The law in New York "places a heavy burden on malicious prosecution plaintiffs." Rothstein v. Carriere, 373 F.3d 275, 282 (2d Cir. 2004) (quoting Smith-Hunter v. Harvey, 734 N.E.2d 750, 752 (N.Y. 2000)).  "While the tort of malicious prosecution protects against the consequences of wrongful prosecution, public policy favors bringing criminals to justice, and accusers must be allowed room for benign misjudgments." Smith-Hunter, 734 N.E.2d 750 at 752.

A claim for malicious prosecution under federal law is "substantially the same" as a claim for malicious prosecution under state law. Lawrence v. City Cadillac, No. 10-cv-3324, 2010 WL 5174209, at *5 (S.D.N.Y. Dec. 9, 2010).  However, in addition to the four elements established under New York law, a plaintiff must also demonstrate "a post-arraignment deprivation of liberty that rises to the level of a constitutional violation." Id.  (quoting Singer v. Fulton Cnty. Sheriff, 63 F.3d 110, 116 (2d Cir. 1995) ("A plaintiff asserting a Fourth Amendment prosecution claim under [Section] 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.'")); see also Rohman v. New York City Transit Auth.,

215 F.3d 208, 215-16 (2d Cir. 2000).  Without such a showing, there is no cognizable harm under § 1983.  <u>Singer</u>, 63 F.3d at 116.

      iii.   <u>Probable Cause as a Complete Defense</u>

The existence of probable cause is a complete defense to claims for false arrest and malicious prosecution.  <u>See, e.g.</u>, <u>Bullard v. City of New York</u>, 240 F. Supp. 2d 292, 297 (S.D.N.Y. 2003) (citing <u>Jocks</u>, 316 F.3d at 134-35 (2d Cir. 2003); <u>Bernard v. United States</u>, 25 F.3d 98, 102 (2d Cir. 1994); <u>L.B. v. Town of Chester</u>, 232 F. Supp. 2d 227, 233 (S.D.N.Y. 2002)).  "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers . . . ."  <u>Weyant</u>, 101 F.3d at 852; <u>see, e.g.</u>, <u>Abdul-Rahman v. City of New York</u>, No. 10-cv-2778, 2012 WL 1077762, at *10 (E.D.N.Y. Mar. 30, 2012) (granting defendants' motion to dismiss because the existence of probable cause was evident as a matter of law).

"Probable cause to arrest exists when the officers have knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution" to believe the arrestee engaged or is engaging in unlawful activity.  <u>Zellner v. Summerlin</u>, 494 F.3d 344, 368 (2d Cir. 2007).  Although a "mere suspicion" of wrongdoing does not constitute probable cause, <u>see</u> <u>Mallory v. United States</u>, 354 U.S. 449, 454 (1957), probable cause focuses on "probabilities" rather than "hard certainties."  <u>Illinois v. Gates</u>, 462 U.S. 213, 231 (1983); <u>see also</u> <u>Zalaski v. City of Hartford</u>, 723 F.3d 382, 389 (2d Cir. 2013).  Thus, probable cause does not require "that a good faith belief be correct or

more likely true than false.  It requires only such facts as make wrongdoing or the discovery of evidence thereof probable." Walcyzk v. Rio, 496 F.3d 139, 157 (2d Cir. 2007) (internal quotations and citations omitted); see also Phelps v. City of New York, No. 04-cv-8570, 2006 WL 1749528, at *2 (S.D.N.Y. 2006) ("The requirement of probable cause does not create a high bar for law enforcement.").

In assessing probable cause, courts look to "whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest." Jaegly v. Couch, 439 F.3d 149, 153 (2d Cir. 2006) (citing Devenpeck v. Alford, 543 U.S. 146, 152 (2004)).  "Once a police officer has a reasonable basis for believing there is probable cause, he is not required to explore and eliminate every theoretically plausible claim of innocence before making an arrest." Ricciuiti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir.1997); see also Grimm v. Krupinsky, No. 04-cv-2913, 2005 WL 1586978, at *1 (2d Cir. July 7, 2005).

However, in Boyd v. City of New York, 336 F.3d 72 (2d Cir. 2003), the Second Circuit "distinguished the probable cause necessary to defeat a false arrest claim from that required to defeat a malicious prosecution claim . . . ." Gannon v. City of New York, 917 F. Supp. 2d 241, 245 (S.D.N.Y. 2013); see also Boyd, 336 F.3d at 75 ("If there was probable cause for the arrest, then a false arrest claim will fail. Similarly, if there was probable cause for the prosecution, then no malicious prosecution claim can stand." (internal citation omitted)).  In the context of malicious prosecution, probable cause exists when the facts and circumstances "would lead a reasonably prudent person to believe the plaintiff guilty" of the

alleged wrongful conduct.  <u>Boyd</u>, 336 F.3d at 76.  Put simply, the issue with respect to malicious prosecution is whether probable cause exists "as of the time the judicial proceeding is commenced," as opposed to at the time of the arrest.  <u>Peterson v. Regina</u>, 935 F. Supp. 2d 628, 642 (S.D.N.Y. 2013) (citation omitted).

### 4. <u>Due Process and Deliberate Indifference</u>

Plaintiff was a parolee at the time of his alleged constitutional violation, so "his claim is appropriately analyzed under the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment."  <u>Stovall v. Wilkins</u>, No. 15-cv-2163, 2016 WL 5478509, at *3 (S.D.N.Y. Sept. 29, 2016) (citing <u>Ciccone v. Ryan</u>, No. 14-cv-1325, 2015 WL 4739981, at *3 (S.D.N.Y. Aug. 7, 2015); <u>Rodriguez v. Rivera</u>, No. 12-cv-5823, 2013 WL 5544122, at *4 n.2 (S.D.N.Y. Sept. 16, 2013)).  In general, the Due Process Clause does not confer an "affirmative right to government aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual."  <u>DeShaney v. Winnebago Cty. Dep't of Soc. Servs.</u>, 489 U.S. 189, 196 (1989); <u>see also</u> <u>Matican v. City of New York</u>, 524 F.3d 151, 155 (2d Cir. 2008).

An "exception to this rule exists when there is a special relationship between the state and a plaintiff."  <u>Stovall</u>, 2016 WL 5478509, at *3.  "The Second Circuit has explained that some form of 'involuntary custody' is the 'linchpin of any special relationship exception.'"  <u>Id.</u> (quoting <u>Matican</u>, 524 F.3d at 156).  "As a parolee required to report for certain meetings, Plaintiff's 'freedom to act on his own behalf,' was not limitless."  <u>Id.</u> (quoting <u>Matican</u>, 524 F.3d at 156).  The Second Circuit has

recognized that "[a] parolee, although not in the state's physical custody, is nonetheless in its legal custody, and his or her freedom of movement, while not as restricted as that of an incarcerated prisoner, is nonetheless somewhat curtailed." Jacobs v. Ramirez, 400 F.3d 105, 106 (2d Cir. 2005). Given that a parolee is "required to report to certain meetings, Plaintiff can be said to have a 'special relationship' with the state, giving rise to at least some duties on behalf of the state to protect Plaintiff." Id. (citing Ciccone, 2015 WL 4739981, at *5 ("Under Jacobs, . . . [the plaintiff] and [the defendant, his parole officer,] clearly had the kind of 'special relationship' which could subject [the defendant] to liability notwithstanding the general rule of DeShaney." (alterations in original))

"However, even assuming Defendants had a special relationship with Plaintiff, and that Defendants violated an attendant duty owed to Plaintiff by requiring him to travel to his meeting despite his injuries, Defendants can be held liable only if their behavior was so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Id. (internal quotations omitted). In this respect, the conduct "must be truly 'brutal and offensive to human dignity.'" Lombardi v. Whitman, 485 F.3d 73, 81 (2d Cir. 2007) (quoting Smith v. Half Hollow Hills Cent. Sch. Dist., 298 F.3d 168, 173 (2d Cir. 2002)). This requirement "screens out all but the most significant constitutional violations." Matican, 524 F.3d at 155. "To guide courts as to what conduct may be conscience-shocking, the Supreme Court has explained that 'negligently inflicted harm is categorically beneath the threshold of constitutional due process,' while 'conduct intended to injure in some way[,]

unjustifiable by any government interest[,] is the sort of official action most likely to rise to the conscience-shocking level.'" Stovall, 2016 WL 5478509, at *3 (quoting Lewis, 523 U.S. at 849).

> As to property:
>
> an unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth Amendment if a meaningful postdeprivation remedy for the loss is available. For intentional, as for negligent deprivations of property by state employees, the state's action is not complete until and unless it provides or refuses to provide a suitable postdeprivation remedy.

Hudson v. Palmer, 468 U.S. 517, 533 (1984).

### 5. Failure to Supervise and/or Intervene

"Personal involvement of the defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983." Styles v. Goord, 431 Fed. App'x 31, 33 (2d Cir. 2011) (citing Styles, 347 F.3d at 435 (2d Cir. 2003)). "The mere fact that a defendant possesses supervisory authority is insufficient to demonstrate liability for failure to supervise under § 1983." Id.

However, "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citing O'Neill v. Krzeminski, 839 F.2d 9, 11 (2d Cir. 1988)). "An officer who does not personally inflict the injury at the core of an excessive use of force claim may still be liable under § 1983 where the officer fails to intervene to prevent the harm, in spite of a realistic opportunity to do so,

observes or has reason to know that excessive force is being used." <u>Allen v. City of New York</u>, 480 F. Supp. 2d 689, 694 (S.D.N.Y. 2007) (internal quotations omitted). "Whether an officer had sufficient time to intercede or was capable of preventing the harm being caused by another officer is an issue of fact for the jury unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." <u>Id.</u> (quoting <u>Anderson</u>, 17 F.3d at 557).

6. <u>Section 1983 Conspiracy Claims</u>

"[A]lthough the pleading of a conspiracy will enable a plaintiff to bring suit against purely private individuals, the lawsuit will stand only insofar as the plaintiff can prove the <u>sine qua non</u> of a § 1983 action: the violation of a federal right." Singer, 63 F.3d 110, 119 (2d Cir. 1995). Thus, to sustain a § 1983 conspiracy claim, a plaintiff must properly allege a violation of his constitutional rights.

C. <u>Absolute and Qualified Immunity</u>

"Parole officers receive absolute immunity for their actions in initiating parole revocation proceedings and in presenting the case for revocation to hearing officers, because such acts are prosecutorial in nature." <u>Scotto v. Almenas</u>, 143 F.3d 105, 112 (2d Cir. 1998) (collecting cases). In addition, "principles of qualified immunity shield an officer from personal liability when an officer reasonably believes that his or her conduct complies with the law." <u>Pearson v. Callahan</u>, 555 U.S. 223, 244 (2009). A "two-step sequence—defining constitutional rights and only then conferring immunity—is sometimes beneficial to clarify the legal standards governing public officials," though courts may decide to take those steps in either

order.  Camreta v. Greene, 563 U.S. 692, 707 (2011); see also Saucier v. Katz, 533 U.S. 194 (2001) (explaining the two-step inquiry).  And "in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, inter alia, the defendant's personal involvement in the alleged constitutional deprivation."  Grullon v. City of New Haven, 720 F.3d 133, 138 (2d Cir. 2013).  "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983."  Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994) (citation and internal quotation omitted)).

## III.  DISCUSSION

Here, the Court groups plaintiff's claims as follows: first, it addresses all claims relating to his parole revocation and fourteen-day period of incarceration in 2014; second, it addresses all claims relating to his parole revocation and subsequent (ongoing) incarceration in 2016; and third, it addresses his claims of deliberate indifference.

### A.  2014 Parole Revocation

As discussed in more detail above, plaintiff alleges that his parole was revoked three days after his release from prison based on his failure to report to his assigned residence as well as his failure to inform his parole officer of his new address.  (Am. Compl., Ex. E.)  He concedes that he was not, in fact, in his assigned residence at the time, though he proffers reasons for that.  Plaintiff requested a preliminary hearing, after which he was released.  In connection with this

revocation, plaintiff alleges false arrest, malicious prosecution, retaliation in violation of the First Amendment, a violation of his right to due process, failure to intervene, failure to supervise, and conspiracy under § 1983.

Based on the facts alleged, defendants had probable cause to initiate parole revocation proceedings. As stated, plaintiff concedes that he was not staying at Narco Freedom (for whatever reason), even though he had received and signed an agreement that he would report there, and that he would inform his parole officer of any change in address. In addition, the case summary written by Dumberger and Freeman—submitted to the Court with plaintiff's Amended Complaint—noted that although plaintiff "indicated he went to Narco-Freedom on 2/28/14 . . . [p]hone calls to the residence revealed that this was not the case, and had the subject gone to the residence he would not have been turned away." (Am. Compl., Ex. G.) This is certainly "reasonably trustworthy information" to warrant a belief that plaintiff engaged in unlawful activity; namely, that he violated at least one condition of his release by failing to inform his parole officer of a change in address. <u>Zellner</u>, 494 F.3d at 368. (<u>See also</u> Am. Compl. Ex. A.) These facts, known by the defendants at the time of plaintiff's parole revocation, "objectively provided probable cause to arrest." <u>Jaegly</u>, 439 F.3d at 153. As such, the parole officers reasonably believed that plaintiff failed to comply with a condition of his release; this is a complete defense to plaintiff's claim false arrest. Additionally, the existence of probable cause in this scenario vitiates plaintiff's malicious prosecution claim, as it also served as "probable cause for the prosecution." <u>Boyd</u>, 336 F.3d at 75.

As to plaintiff's retaliation claim, while the LOC qualifies as protected speech, plaintiff fails to sufficiently allege a "causal connection between the protected speech and the adverse action." See Espinal, 558 F.3d at 128. Plaintiff alleges that Dumberger retaliated against the LOC by amending the 2014 violation of release report to include a claim for threatening deadly physical force against Dumberger. (See Am. Compl., Ex. I.) Plaintiff does not allege how filing the violation of release report was related to the LOC, other than a conclusory claim that the "act of incorporating Charge #3 in the Supplemental VORR, which was based upon [the LOC] . . . was retaliatory." (Am. Compl. ¶ 24.) Plaintiff fails to "aver 'tangible proof' demonstrating that [plaintiff's] protected speech animated" the adverse action; he may not rely "on conclusory assertions of retaliatory motive." Washington, 373 F.3d at 321 (quoting Deters, 368 F.3d at 190). As such, his First Amendment claim must fail.

The Amended Complaint also fails to state a claim for a due process violation in connection with the 2014 proceedings. There is no specific allegation regarding a violation of a due process right. Plaintiff expressly alleges that he received a hearing, after which he was restored back to parolee status, (Am. Compl. ¶ 17), and the fourteen-day delay between the violation and the hearing was within the statutory fifteen-day limit, see 9 N.Y.C.R.R. § 8005.6(a).

Finally, because plaintiff has not stated a claim for a deprivation of his constitutional rights in connection with the 2014 proceedings, he cannot sustain a claim for failure to supervise or intervene as to defendant Freeman or as to

conspiracy under § 1983 as to Johnson, Jones, Campbell, Freeman, and Dumberger. If no right is being violated, there is no duty to intervene or supervise differently, and there can be no claim of conspiracy.

In conclusion, plaintiff fails to state a claim for any violation of his constitutional rights in connection with the 2014 parole revocation proceedings.

B. <u>2016 Home Search and Parole Revocation</u>

In connection with the search of his residence and seizure of his property in 2016, plaintiff alleges a violation of his Fourth Amendment rights, a violation of his due process rights, failure to intervene, and conspiracy.

As a condition of his parole, plaintiff expressly consented to searches of his person, residence, and property. (Am. Compl., Ex. A.) This, in and of itself, vitiates plaintiff's Fourth Amendment claim for an improper search, as he had previously given consent. Plaintiff also agreed that he would not own, possess, or purchase a weapon, (<u>id</u>), so when the officers arrived at his premises on September 16, 2016 and found him in possession of an imitation handgun and a gravity knife, they immediately had probable cause to believe plaintiff had violated a condition of his release. (<u>See</u> Am. Compl., Exs. M, K, L.) As such, plaintiff cannot maintain a claim for improper seizure of those items or of his keys as he was taken into custody.

Additionally, plaintiff cannot maintain a claim against Folk or Ancrum for failure to intervene or prevent Campbell from seizing Reid's property. Because Reid does not state a plausible claim that he suffered from a violation of a constitutional right, it cannot be the case that Folk or Ancrum improperly failed to intervene. The

same goes for conspiracy; as discussed above, unless it is plausible that a constitutional right was violated, there can be no plausible conspiracy claim.

Finally, while plaintiff alleges generally that he did not receive due process, there is no specific allegation supporting the claim. Even if the seizure of his property was unauthorized, this would not be a violation of due process unless there is no meaningful post-deprivation remedy. New York has a procedure by which discharged inmates may retrieve their property; plaintiff will be able to avail himself of that process once released from incarceration.

As such, the 2016 home visit and subsequent re-incarceration is not enough to allege any violation of plaintiff's constitutional rights.

C. Deliberate Indifference

Broadly, plaintiff asserts deliberate indifference in two regards: general indifference to the safety of parolees and others, as well as specific indifference as to plaintiff in the officers' failure to recognize his need for anger management classes. Defendants may only be liable for deliberate indifference if their conduct would "shock the contemporary conscience." Matican, 524 F.3d at 155. The fact that parole officers carry weapons is not, by any standard, "egregious" or "outrageous." See id.

No allegation supports an inference of shocking indifference by the parole officers, including the allegation that they should have recognized his need for anger management classes. Plaintiff alleges that he was provided with a mental health evaluation before his release. (Am. Compl. ¶ 5.) There is no requirement

that parole officers anticipate the likelihood of violence by a parolee, nor that they perform mental assessments of their subjects. The fact that plaintiff had been incarcerated for fifteen years cannot be enough to allege that defendants should have known of his need for anger management. Additionally, plaintiff's allegations regarding the October 24, 2014 incident do not demonstrate that any defendant should have provided plaintiff with anger management classes, as it is not alleged that any defendant knew the incident was likely to occur. Of course, even if they had, it would still be unlikely that the failure to require anger management classes would rise to the level of "shocking" indifference.

Additionally, plaintiff claims that defendants were generally indifferent to the safety of parolees because they carry service weapons. According to plaintiff, a parolee could take one of these weapons off of an officer and hurt somebody. Again, though, plaintiff fails to allege that the practice of carrying service weapons is egregiously indifferent to parolees' safety. Indeed, it could easily be the case that it would be <u>less</u> safe for parolees if parole officers did not carry weapons. A speculative assertion as to parolees' safety in this regard cannot defeat a motion to dismiss.

To conclude, plaintiff fails to provide specific allegations of shocking indifference by defendants, and he is thus unable to maintain a claim for deliberate indifference.

D. <u>Absolute and Qualified Immunity</u>

Additionally, because each defendant officer was reasonable to believe his conduct was legal (as discussed above), each is shielded by qualified immunity. Furthermore, any of Freeman's, Dumberger's or Jones's acts relating to the 2014 hearing are barred by absolute immunity for parole officers with acts related to revocation proceedings.

E. <u>State Law Claims</u>

Having dismissed all of plaintiff's federal law claims, the Court declines to exercise supplemental jurisdiction over any remaining state law claims.

IV.    CONCLUSION

For the reasons stated above, the Court hereby GRANTS defendants' motion to dismiss at ECF No. 47 in its entirety.  Plaintiff's Amended Complaint at ECF No. 41 is DISMISSED.  The Clerk of Court is directed to terminate this action, 17-cv-1124.

SO ORDERED.

Dated:    New York, New York
          February 12, 2018

_____
          KATHERINE B. FORREST
          United States District Judge

**Copy To:**
Cedric Reid
241-16-06623
G.R.V.C.
09-09 Hazen Street
East Elmhurst, New York 11370